In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00056-CV
______________________________


CLYDE MURFF HARDY AND
BARBARA J. HARDY, Appellants
 
V.
 
DENVER C. MARSH, JR., M.D., Appellee


                                              

On Appeal from the 51st Judicial District Court
Tom Green County, Texas
Trial Court No. A-04-1040-C


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          Clyde Murff Hardy and Barbara J. Hardy sued Denver C. Marsh, Jr., M.D., for
medical malpractice. The trial court dismissed the suit because of an inadequate expert
report filed pursuant to Section 74.351 of the Texas Civil Practice and Remedies Code,



and awarded Marsh his reasonable attorney's fees. The Hardys appeal, contending the
report complied with the statute and further contending that, if the report was not in
compliance, the trial court abused its discretion in failing to grant them a thirty-day
extension in which to cure the defect. We affirm.
Background
          Clyde Hardy was a known diabetic. On August 5, 2002, he was admitted to
Shannon West Texas Memorial Hospital in San Angelo, suffering from an acute myocardial
infarction. Marsh, a cardiologist, was Clyde's attending physician. Marsh performed a
catheterization and coronary angioplasty on Clyde. Following the surgery, Clyde initially
appeared to be doing well, but eventually developed the onset of pain and weakening in
his legs, particularly on the right side. Clyde thought he had a "blood clot," as he had
suffered from them in the past. Marsh dismissed Clyde from the hospital August 9, 2002. 
The pain in Clyde's right leg persisted, and on August 12, 2002, he was readmitted to the
hospital. A "right iliofemoral thromboembolectomy" was performed immediately, but three
days later an above-the-knee amputation of Clyde's right leg became necessary. The
Hardys alleged in their lawsuit that Marsh's negligence in failing to properly investigate
Clyde's complaint and in failing to consult a specialist proximately caused the loss of
Clyde's leg and the other attendant injuries and resulting damages.
          In compliance with Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), the Hardys filed
an expert report prepared by Robert R. Cassella, M.D. Claiming the report did not comply
with the Code requirements, Marsh moved to dismiss the lawsuit with prejudice. See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(l), (r)(6). The trial court agreed and dismissed the
Hardys' case with prejudice. The trial court also denied the Hardys' motion for an
extension of time in which to cure the expert report. 
The Report
          The Hardys first contend the trial court abused its discretion when it determined
Cassella's expert report did not constitute a good-faith effort to meet the statutory
requirements of the Code. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l). Marsh
alleges the report is deficient in its failure to adequately state the standard of care, a
breach of that standard, and causation. Marsh also contends the report is conclusory and
speculative.
          The expert report states, in relevant part, as follows:
This 77-year old [sic] gentleman presented to the emergency room with an
acute myocardial infarction in progress, associated with severe bardycardia
[sic] and hypotension. According to the records, his attending physician was
a Dr. Denver C. Marsh, a cardiologist.
 
Accordingly, the patient underwent angiography, which included left heart
catherterization [sic], left ventricular angiogram, supra-valvular aortogram,
bilateral coronary angiogram, saphenous vein graft, left internal mammary
artery graft and coronary angioplasty of the circumflex coronary artery.
 
Following his surgery, he initially appeared to be doing well, but he eventually
developed the onset of pain and weakening in his legs, particularly on the
right side. He made several complaints regarding this, both to Dr. Marsh and
the attending staff. In one instance prior to release from the hospital, his
right leg gave out. . . .
 
Approximately one week following his surgery, there was noted gross
discoloration of his right lower extremity from the knee down. It was noted
that, although he had a strong femoral pulse on the left, he had no femoral
pulse on the right. Upon readmission to the hospital, impressions were as
follows:
 
          1.       Thrombosis of the right limb of aorto-femoral bypass graft
          2.       Post cardiac catheterization with severe ischemia prolonged of
the right lower extremity for four days
 
          . . . .
 
On one of his recent post-operative visits to his physician Dr. Marsh, he
relatedly [sic] stated that the pain in his right leg continued. There was a
pulse in the right lower extremity with mottle and some coolness of the right
leg below the level of the knee. He was seen by surgeon Dr. J. Michael
Cornell regarding this, whose impression [was] that this patient had a
superficial femoral artery occlusion and dysfunction of the right limb of the
aortal femoral bypass. He suggested an emergency thromboembolectomy,
a possible fem-fem bypass graft to salvage the right lower extremity.
 
On 8-12-02, the patient underwent a right iliofemoral thromboembolectomy
and a right four compartment fasciotomy, under the direction of
Dr. J. Michael Cornell. Dr. Cornell states that should he not show
improvement the following day, that it was likely that he should be returned
to the operating room for debridement or amputation as the findings of
surgery would dictate.
 
 
          . . . .
 
An important consideration which would help discern procedures to be
followed would be a demonstration of an adequate run-off to the vessels
supplying the legs. Judicious use of aortagrams [sic] and more distal
arteriorgrams [sic] are considered important adjuncts in the precise and
effective management of ischemic disease of the lower extremities. 
 
It is my opinion that this patient should have had a consultation with a
vascular surgeon in view of his complaints before his discharge on 8-9-02. 
I recognize fully the importance of his other medical problems. It is my
opinion then that if this patient had had more immediate treatment that a
salvage of his right leg would have been more probable. In my opinion,
Dr. Marsh's failure to seek such a consultation and to use such diagnostic
means was not in accordance with the applicable standard of care.

          A.       Standard of Review
          To constitute a good-faith effort to establish the causal relationship element under
the Act, the expert report need not marshal all of the plaintiff's proof, or present evidence
as if the plaintiff was actually litigating the merits. See Bowie Mem'l Hosp. v. Wright, 79
S.W.3d 48, 52–53 (Tex. 2002); Am. Transitional Care Ctrs. v. Palacios, 46 S.W.3d 873,
878 (Tex. 2001). No magic words such as "reasonable probability" are required for the
report to comply with the Act. Wright, 79 S.W.3d at 53. The report, however, must provide
enough information within the document both to inform the defendant of the specific
conduct at issue and to allow the trial court to conclude that the suit has merit. Id. at 52;
Palacios, 46 S.W.3d at 879. A report merely stating the expert's conclusions about the
standard of care, breach, and causation does not fulfill these two purposes. Palacios, 46
S.W.3d at 879. Finally, in assessing the adequacy of the report, the trial court must look
only within the four corners of the report, and inferences are not permitted. Wright, 79
S.W.3d at 53; Palacios, 46 S.W.3d at 878. We review under an abuse of discretion
standard a trial court's dismissal of a suit for failure to comply with the Code.


 Wright, 79
S.W.3d at 52; Palacios, 46 S.W.3d at 877. 
          B.       The Report Failed To State an Applicable Standard of Care and its Breach

          The Hardys rely primarily on two sentences in Cassella's report as establishing the
standard of care:
An important consideration which would help discern procedures to be
followed would be a demonstration of an adequate run-off to the vessels
supplying the legs. Judicious use of aortagrams [sic] and more distal
arteriorgrams [sic] are considered important adjuncts in the precise and
effective management of ischemic disease of the lower extremities. 

Thus, the Hardys argue that the failure to use such diagnostic procedures was not in
accordance with the applicable standard of care. 
          The standard of care for a doctor is what a reasonable and prudent doctor would
have done under the same or similar circumstances. See Snow v. Bond, 438 S.W.2d 549,
550–51 (Tex. 1969). Identifying the standard of care is critical because "[w]hether a
defendant breached his or her duty to a patient cannot be determined absent specific
information about what the defendant should have done differently." Palacios, 46 S.W.3d
at 880. 
          The statements on which the Hardys rely are not statements of a standard of care. 
The first statement refers to "[a]n important consideration"—not a standard of care—"which
would help discern procedures to be followed." The report then identifies that "important
consideration" as "a demonstration of an adequate run-off to the vessels supplying the
legs." And the second sentence refers to two tests presumably used in diagnosing or
treating diseases of the lower extremities. The report does not state the procedures or
treatments that should have been followed when Clyde complained of leg pain; instead,
it merely states the general procedures and tests used to diagnose and treat "ischemic
disease of the lower extremities." 
          Cassella's further statement—that Marsh's failure to seek consultation with a
vascular surgeon and to use "such diagnostic means" was not in accordance with the
applicable standard of care—does not put Marsh on notice of the specific conduct at issue. 
"It is not sufficient for an expert to simply state that he or she knows the standard of care
and concludes it was [or was not] met." Palacios, 46 S.W.3d at 880; see Chopra v.
Hawryluk, 892 S.W.2d 229, 233 (Tex. App.—El Paso 1995, writ denied). Nowhere does
Cassella's report identify Clyde's specific symptoms requiring consultation with a vascular
surgeon, when such consultation was required, or what treatment by such surgeon was
required. Neither does the report specify what results the diagnostic tests would have
been expected to reveal or what treatment would have been appropriate as a result of
those tests. 
          When the conclusory statements in the expert report do not put a defendant on
notice of the conduct complained of and allow the trial court to deduce that the suit has
merit, Section 74.351(l) affords the trial court no discretion but to conclude, as the trial
court did here, that the report does not represent a good-faith effort to provide a fair
summary of the standard of care and how it was breached, as Section 74.351(r)(6)
requires. Because the 120 days prescribed by Section 74.351(a) had passed when the
trial court made that determination, Section 74.351(b) required the court to dismiss the
Hardys' claims against Marsh with prejudice. 
          C.       The Expert Report Failed To Establish a Causal Relationship
          The Hardys rely mostly on one paragraph in the report to establish causation:
It is my opinion that this patient should have had a consultation with a
vascular surgeon in view of his complaints before his discharge on 8-9-02. 
I recognize fully the importance of his other medical problems. It is my
opinion then that if this patient had had more immediate treatment that a
salvage of his right leg would have been more probable.

Nothing in this paragraph links Marsh's alleged inaction (immediate treatment as opposed
to discharge) to Clyde's injury (the amputation). The report merely states that Clyde
"should have had a consultation with a vascular surgeon." It does not state what additional
procedures or treatment would have been provided by the surgeon. Nor does it connect
the consultation to avoidance of the amputation. Nowhere in the expert report does
Cassella set forth factors or explain the medical basis for his opinion that "if this patient
[Clyde] had had more immediate treatment that a salvage of his right leg would have been
more probable." 
          While a "fair summary" is something less than all the evidence necessary to
establish causation at trial, even a fair summary must contain sufficiently specific
information to demonstrate causation beyond mere conjecture in order to meet the Code's
requirements and satisfy the Palacios test. See Wright, 79 S.W.3d at 52. Cassella's report
fails to provide sufficiently specific information to show more than speculation on the
element of causation.
          We conclude it was well within the trial court's discretion to find that the report did
not meet the Code's requirement on the element of causation and to dismiss with prejudice
the Hardys' claims against Marsh. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b), (l).
Granting An Extension

          In the Hardys' second issue, they contend the trial court abused its discretion in
denying their motion for a thirty-day extension because, in case of an inadequate expert
report, "may" in Section 74.351(c) must be read as a "shall" or very close to a "shall." See
Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c). 
          Section 74.351(c) provides:
If an expert report has not been served within the period specified by
Subsection (a) because elements of the report are found deficient, the court
may grant one 30-day extension to the claimant in order to cure the
deficiency. 
 
The use of the word "may" in a statute shows that the provision is discretionary and not
mandatory. Roberts v. Med. City Dallas Hosp., Inc., 988 S.W.2d 398, 402 (Tex.
App.—Texarkana 1999, pet. denied); Weldon v. Weldon, 968 S.W.2d 515, 518 (Tex.
App.—Texarkana 1998, no pet.). When a trial court's function is discretionary and not
mandatory, the reviewing court should give deference and wide latitude to the decision of
the trial court. Roberts, 988 S.W.2d at 402. We should reverse only on a showing of a
clear abuse of discretion. Id. 
          The Hardys argue that the Legislature has not provided any guidance as to what the
word "may" means in this provision. Hence, in the absence of any guidance, "may" should
be treated as "shall." We disagree. The word "may" creates discretionary authority. See
Tex. Gov't Code Ann. § 311.016(1) (Vernon 2005). By using the word "may," Section
74.351(c) plainly vests the trial court with discretion to grant an extension. See Tex. Gov't
Code Ann. § 312.002 (Vernon 2005) ("words shall be given their ordinary meaning"). The
Hardys have not presented us with authority to hold otherwise. 
          We agree that a trial court should not arbitrarily or unreasonably withhold an
extension. However, as pointed out to the trial court at the hearing on Marsh's motion to
dismiss, the Hardys gave presuit notice of their claims almost a year before filing suit. The
trial court could have reasonably believed the Hardys had already had sufficient time to
obtain an adequate report. Under these circumstances, we cannot say the trial court
abused its discretion in refusing to grant an extension.
Conclusion
          We affirm the trial court's judgment. 
 


                                                                          Donald R. Ross
                                                                           Justice

Date Submitted:      July 6, 2005
Date Decided:         August 17, 2005